IN THE SUPERIOR COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

WAYNE JAMES,

) CASE NO. SX-2005-CV-00356
)
Plaintiff, ) ACTION FOR DAMAGES
vs. )
)
WARREN MOSLER and )
ELIZABETH O'TOOL )
) JURY TRIAL DEMANDED
)
Defendants. )

Cite as: 2021 VI Super 53U

**MEMORANDUM OPINION**

¶1    THIS MATTER is before the Court on:

1.    Defendants' Motion For Summary Judgment On Plaintiff's Complaint And Cross Motion For Partial Summary Judgment In Defendant's Counterclaim and Memorandum In Support Of Defendants' Motion For Summary Judgment And Mosler's Motion For Partial Summary Judgment On The Counterclaim ("Motion For Summary Judgment"), filed April 7, 2009;

2.    Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment and Plaintiff's Response To Statement Of Facts And Counter Statement Of Material Facts ("Opposition"), filed June 16, 2009;

3.    Defendant's Response To Plaintiff's Counterstatement Of Material Fact; filed July 10, 2009; and

4.    Defendant's Reply To James' Opposition To Defendant's Motion For summary Judgment ("Reply"), filed July 14, 2009.

¶2    The breach of contract claim contained in Count I of the Complaint will be dismissed as to Elizabeth O'Tool ("O'Tool"), as the evidence indicates she was not a party to the alleged contract, but not as to Warren Mosler ("Mosler"), as there exists genuine issues of material fact regarding the purported agreement. The breach of contract claim contained in Count II will be dismissed, as Wayne James ("James") was the one who cancelled the contract and, alternatively, the money he retained from the contract far exceeds what he might expect in damages.

¶3    James's fraud and fraudulent misrepresentation claims contained in Count III and IV will be dismissed on account of the gist of the action doctrine and James's inability to adequately demonstrate monetary loss. James's intentional infliction of emotional distress claim contained in Count V will be dismissed for failure to provide evidence of damages to himself or physical harm

to a third party. James's "punitive damages claim" contained in Count VI will be denied as the Virgin Islands does not recognize a standalone claim for punitive damages.

¶4     The Court will reserve ruling on Mosler and O'Tool's counterclaim for an accounting contained in Count I of the Answer And Counterclaims as there are outstanding discovery motions related to it. The Court will deny Defendants' Motion for Summary Judgment on Count II of Defendants' counterclaims, as there exists genuine issues of material fact regarding the hotel refurbishment contract.

## I.     INTRODUCTION

¶5     Plaintiff James filed his Complaint on June 2, 2005, in which he alleges six (6) counts against Defendants Mosler and O'Tool: Count I – Breach of Contract; Count II – Breach of Agreement; Count III – Fraudulent Misrepresentation; Count IV – Fraud; Count V – Intentional Infliction of Emotional Distress; Count VI – Punitive Damages. On July 19, 2005, Mosler and O'Tool filed their Answer And Counterclaims, alleging three (3) counts against James: Count I – Action for Accounting; Count II – Breach of Contract; and Count III – Defamation.

¶6     This case revolves around two (2) alleged business arrangements between the parties: 1) the reproduction, for a hotel, of fourteen (14) to sixteen (16)[1] antique mahogany furniture pieces based off pieces in James's collection (the "Hotel Refurbishment Contract"); and 2) the auction of antique furniture and other items on St. Croix (the "Auction Contract").[2] Mosler is a minor owner of the hotel and O'Tool has no relation to the hotel.[3] Also at issue in this case is a photograph, taken after the auction, of a bag, which was filled with money, bearing the Governor of the Virgin Islands' seal.[4]

¶7     Currently, there are still pending motions to compel discovery, although Mosler and O'Tool aver that the record is sufficiently developed to support summary judgment in their favor on James' claims and partial summary judgment in their favor on their counterclaims.[5] Mosler and O'Tool indicate once the pending discovery motions are addressed, they will seek further relief on their counterclaims.[6] Mosler and O'Tool's Motion For Summary Judgment with respect to their counterclaims is unopposed.

---

[1] James states in his Complaint the amount is sixteen (16) furniture pieces but later both parties refer to fourteen (14) furniture pieces.

[2] Pl.'s Compl. ¶¶ 5-6, 9-10; Pl.'s Opp'n 3.

[3] Defs.' Mot. For Summ. J. 3.

[4] Pl.'s Compl. ¶ 21.

[5] Defs.' Mot. For Summ. J. 1-2.

[6] Defs.' Mot. For Summ. J. 1-2.

## II.    LEGAL STANDARD

### A.    Summary Judgment

¶8    Summary Judgment is governed by Rule 56 of the Virgin Islands Rules of Civil Procedure, which states:

> A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.[7]

¶9    Or, as the Virgin Islands Supreme Court stated in *Antilles School, Inc. v. Lembach*,[8] summary judgment is appropriate when after "considering all of the evidence, accepting the nonmoving party's evidence as true, and drawing all reasonable inferences in favor of the nonmoving party, the court concludes that a reasonable jury could only enter judgment in favor of the moving party."[9]

¶10    Summary judgment is a "drastic remedy" and only proper where "the pleadings, the discovery and disclosure materials on file . . . show that there is no genuine issue as to any material fact[.]"[10] The nonmoving party must show in its response to a motion for summary judgment that there are "specific facts showing a genuine issue for trial."[11] In addition, "[t]he non-moving party may not rest upon mere allegations but must present actual evidence showing a genuine issue for trial. Such evidence may be direct or circumstantial, but the mere possibility that something occurred in a particular way is not enough[.]"[12] For a nonmoving party to show some genuine issue of material fact for trial, "'the nonmoving party may not rest on its allegations alone, but must present actual evidence, amounting to more than a scintilla,' in support of its position."[13] Further, "[i]f the non-movant offers evidence that is 'merely colorable' or not 'significantly probative,' summary judgment may be granted."[14]

¶11    Importantly, the "Court may not itself weigh the evidence and determine the truth; rather, we decide only whether there is a genuine issue for trial such that a reasonable jury could return a

---

[7] V.I. CIV. P. 56(a).

[8] 64 V.I. 400 (V.I. 2016).

[9] *Id.* at 409.

[10] *Anthony v. FirstBank Virgin Islands*, 58 V.I. 224, 228 (V.I. 2013) (quoting *Williams v. United Corp.*, 50 V.I. 191, 194 (V.I. 2008)).

[11] *Williams v. United Corp.*, 50 V.I. 191, 194 (V.I. 2008) (quoting FED. R. CIV. P. 56(e)).

[12] *Id.* at 229 (quoting *Williams*, 50 V.I. at 194-95).

[13] *Anderson v. American Fed'n of Teachers*, 67 V.I. 777, 789 (V.I. 2017) (quoting *Perez v. Ritz-Carlton (Virgin Islands), Inc.*, 59 V.I. 522, 527-28 (V.I. 2012)).

[14] *Pemberton Sales & Serv. v. Banco Popular de P.R.*, 877 F. Supp. 961, 965 (D.V.I. 1994).

verdict for the non-moving party."[15] Relevant to this case, "[w]hile summary judgment in some cases will be appropriately denied as premature due to outstanding discovery, the fact that discovery is incomplete will not bar the granting of a summary judgment motion in all cases."[16] Further, Rule 56(c)(2)(B)(ii) states that a party opposing summary judgment must address the facts the movant has relied on and, when disputed, state "that the fact is disputed and provid[e] affidavit(s) or citations identifying specifically the location(s) of the material(s) in the record relied upon as evidence relating to each such material fact, by number."[17]

¶12     When determining whether a party that relies solely on self-serving deposition testimony has met its burden, the Court should consider whether the self-serving testimony, when juxtaposed with other evidence provided, "is sufficient for a rational factfinder to credit Plaintiff's testimony, despite its self-serving nature."[18] Lastly, Rule 56(e) provides that:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or (4) issue any other appropriate order.[19]

### B.     Breach of Contract

¶13     This Court stated in *Mayhem Enters, LLC v. Powell*[20] that to prove breach of contract the plaintiff must demonstrate: "1.) the existence of an agreement; 2.) a duty created by that agreement; 3.) a breach of that duty; and 4.) damages caused by the breach."[21]

### C.     Fraud & Fraudulent Misrepresentation

¶14     This Court conducted a *Banks* analysis in *Merchants Commercial Bank v. Oceanside Village, Inc.*[22] and established that the soundest rule for fraudulent misrepresentation is:

> One who makes a misrepresentation of fact, opinion, intention, or law that he or she either knew or had reason to know was false, and that was made for the purpose of inducing another to act or refrain from acting on it, is subject to

[15] *Williams*, 50 V.I. at 195 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

[16] *Charles v. CBI Acquisitions, LLC*, Super. Ct. Civ. No. ST-15-CV-279, 2016 V.I. LEXIS 62, at *24 (V.I. Super. Ct. May 9, 2016).

[17] V.I. R. Civ. P. 56(c)(2)(B)(ii).

[18] *Johnson v. MetLife Bank, N.A.*, 883 F. Supp. 2d 542, 549 (E.D. Pa. 2012); *see also Irving v. Chester Water Auth.*, 439 Fed. Appx. 125, 127 (3d Cir. 2011) ("In light of both his earlier testimony and the other record evidence, Irving's subsequent self-serving deposition testimony is insufficient to raise a genuine issue of material fact.").

[19] V.I. R. Civ. P. 56(e).

[20] Super. Ct. Case No. ST-10-CV-125, __ V.I. __, 2015 V.I. LEXIS 132, at *1 (V.I. Super. Ct. Oct. 30, 2015).

[21] *Id.* at *10-11 (citing *United Corp. v. Tutu Park. Ltd.*, 55 V.I. 702, 707 (V.I. 2011)).

[22] 64 V.I. 3 (V.I. Super. Ct. 2015).

liability to the other for pecuniary loss caused by the other's justifiable reliance on the misrepresentation.[23]

¶15    The Court adopts the rationale presented in *Merchants*. Further, to prove fraudulent misrepresentation in a contract, this Court in *Guardian Ins. Co. v. Estate of Knight-David*[24] stated that the plaintiff must show the person who created the contract "intends his assertion to induce a party to manifest his assent" and further that the contract-maker "(a) knows or believes that the assertion is not in accord with the facts, or (b) does not have the confidence that he states or implies in the truth of the assertion, or (c) knows that he does not have the basis that he states or implies for the assertion."[25] The elements of fraudulent misrepresentation are largely the same as the elements of fraud.[26]

¶16    The Virgin Islands Rule of Civil Procedure 9(b) states that when alleging fraud, "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[27] Thus, there is a particularity requirement that one plead "matters such as the time, place, and content of the false misrepresentations, the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fraud."[28]

### D.    Gist of the Action Doctrine

¶17    In *Pollara v. Chateau St. Croix, LLC*[29] this Court conducted a *Banks* analysis and adopted the "gist of the action doctrine."[30] The doctrine "addresses 'the concern that tort recovery should not be permitted for contractual breaches'" and "'precludes tort suits for the mere breach of contractual duties unless the plaintiff can point to separate or independent events giving rise to the tort.'"[31] In essence, if plaintiff's tort claim merely duplicates his breach of contract claim, the gist of the action doctrine bars the claim.

### E.    Infliction of Emotional Distress

¶18    In *Diaz v. Ramsden*,[32] this Court conducted a *Banks* analysis and adopted the elements of intentional and reckless infliction of emotional distress as laid out in § 46 of the Restatement (Second) of Torts.[33] Section 46 states:

---

[23] *Id.* at 21-22.

[24] Super. Ct. Case No. ST-08-CV-189, __V.I.__, 2017 V.I. LEXIS 103 (V.I. Super. Ct. Apr. 7, 2017).

[25] *Id.* at *13 (quoting *Pollara v. Chateau St. Croix, LLC*, 58 V.I. 455, 471 (V.I. 2013)).

[26] *Id.* at *13-14 (quoting *Isaac v. Crichlow*, 63 V.I. 38, 57 (V.I. Super. Ct. 2015)).

[27] V.I. R. Civ. P. 9(b).

[28] *Id.* at *14 (quoting *Antoine v. U.S. Bank Nat'l Ass'n*, 547 F. Supp. 2d 30, 35-36 (D.D.C. 2008)).

[29] Super. Ct. Civil No. SX-06-CV-423, __V.I.__, 2016 V.I. LEXIS 49 (V.I. Super. Ct. May 3, 2016).

[30] *Id.* at *10-17.

[31] *Joseph v. Divine Funeral Services, LLC*, 71 V.I. 121, 128-29 (V.I. Super. Ct. 2019) (quoting *Addie v. Kjaer*, 60 V.I. 881, 898-99 (3d Cir. 2013)).

[32] Super. Ct. Case No. ST-2013-CV-491, 2014 V.I. LEXIS 14 (V.I. Super. Ct. Mar. 17, 2014), *rev'd on other grounds*, Super. Ct. Civ. No. 2014-0048, 2015 V.I. Supreme LEXIS 4 (V.I. Feb. 10, 2015).

[33] *Id.* at *91-95.

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.[34]

¶19     The Court herein adopts the sound analysis of *Diaz*. As comment (a) of § 46 states, the elements are the same for both intentional and reckless infliction of emotional distress, and negligent infliction of emotional distress is dealt with in different sections.[35] In *Donastorg v. Daily News Publishing Co., Inc.*,[36] this Court stated that:

In order for a plaintiff's intentional infliction of emotional distress claim to survive a motion for summary judgment, a plaintiff must demonstrate genuine issues of material fact concerning whether a defendant: (1) intentionally or recklessly; (2) engaged in extreme and outrageous conduct that exceeds all possible bounds of decency such that it is regarded as atrocious and utterly intolerable in a civilized society; (3) that caused the plaintiff to suffer severe emotional distress.[37]

¶20     A simple showing that a party acted with tortious or criminal intent is not enough, the actions must be outrageously outside the bounds of civilized society.[38] It is "extremely rare to find conduct in the employment context" that will rise to the necessary level of outrageousness.[39]

## III.     ANALYSIS

### A.     James's breach of contract claims

¶21     James alleges breach of contract as Count I of his Complaint and breach of agreement as Count II. There are two (2) business arrangements with purported contracts or agreements James is suing under. Thus, the Court will consider each in turn below.

---

[34] RESTATEMENT (SECOND) OF TORTS § 46 (1965).

[35] RESTATEMENT (SECOND) OF TORTS § 46 cmt. a (1965) ("This Section is concerned only with emotional distress which is inflicted intentionally or recklessly. As to the negligent infliction of emotional distress, see §§ 312, 313, 436, and 436 A.").

[36] 63 V.I. 196 (V.I. Super. Ct. 2015).

[37] *Id.* at 295.

[38] *Int'l Islamic Cmty. of Masjid Baytulkhaliq v. United States*, 981 F. Supp. 352, 362 (D.V.I. 1997) (citing RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)), *aff'd*, 176 F.3d 472 (3d Cir. 1999).

[39] *McGreevy v. Stroup*, 413 F.3d 359, 371 (3d Cir. 2005) (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 393 (3d Cir. 1988)).

1.      **Breach of the Hotel Refurbishment Contract – Count I**

a.      **Parties' claims and evidence regarding the Hotel Refurbishment Contract**

¶22     James asserts in his Complaint that "[t]he actions of Defendants constitute breach of the contract for Plaintiff to redecorate their hotel."[40] James alleges that in April 2004, Mosler and O'Tool commissioned him to redecorate a hotel;[41] it was agreed James would use sixteen (16)[42] pieces of antique furniture from his collection and reproduce them for the hotel;[43] the project would be completed by September 2004 and he would be paid ten percent (10%) of the total cost as well as expenses.[44] James also maintains that it was agreed that a later agreement concerning an auction would take precedence over the redecoration;[45] that James continued to obtain craftsmen and work on the redecoration;[46] that after the alleged breach of the auction contract, Mosler and O'Tool cancelled the redecoration contract in March 2005;[47] and that the people James had hired to make the furniture were not all paid, which damaged his reputation.[48]

¶23     Mosler and O'Tool state and provide evidence in their Motion For Summary Judgment that Mosler is only a minority owner of the hotel and O'Tool has no interest in it, nor is she an officer, director, or employee of the hotel.[49] Mosler and O'Tool cite to Mosler's own deposition and O'Tool's affidavit, in which O'Tool states she was never an owner or employee of the hotel and Mosler states he is a twenty-four-and-a-half percentage (24.5%) owner.[50] Mosler and O'Tool also point out that James stated in an interrogatory that the agreement was only between Mosler and James and that the furniture pieces "were to be chosen," which Mosler and O'Tool state means that the project would be on a "piece by piece" basis.[51] To support their claim that there was no contract or even a finalized agreement, Mosler and O'Tool cite to the same letter which James references as establishing the agreement and point out that it states that it is a response to Mosler's "suggestion," that the letter provides terms for his "review and input," and that the project total was "TBD."[52] Citing to his own deposition, Mosler says he and James "had a verbal agreement that [they] would just do things on a piece-by-piece basis."[53]

---

[40] Pl.'s Compl. ¶ 39.

[41] Pl.'s Compl. ¶ 5.

[42] As noted *supra* n. 1, this number changes to fourteen (14) in the Motion For Summary Judgment, Opposition, and Reply.

[43] Pl.'s Compl. ¶ 6.

[44] Pl.'s Compl. ¶¶ 7, 8.

[45] Pl.'s Compl. ¶ 11.

[46] Pl.'s Compl. ¶ 12.

[47] Pl.'s Compl. ¶ 25.

[48] Pl.'s Compl. ¶ 26.

[49] Defs.' Mot. For Summ. J. 3; Defs.' Mot. For Summ. J. Ex. 2; Ex. 3.

[50] Defs.' Mot. For Summ. J. Ex. 2 139:14-19 (Deposition of Warren Mosler); Ex. 3 ¶ 2 (Affidavit of Elizabeth O'Tool).

[51] Defs.' Mot. For Summ. J. 3-4; Defs.' Mot. For Summ. J. Ex. 4 Interrog. 1.

[52] Defs.' Mot. For Summ. J. 3-4; Defs.' Mot. For Summ. J. Ex. 5.

[53] Defs.' Mot. For Summ. J. 4; Defs.' Mot. For Summ. J. Ex. 2 143:15-17 (Deposition of Warren Mosler).

¶24    Additionally, citing to James's interrogatories and his own affidavit, Mosler shows he paid to use James's collections and have specifications drawn up.[54] Mosler requested two (2) specific items, chests and round tables, be made and Mosler paid James for forty-nine (49) antique chests and funds for James to go to Denmark to purchase the chests and arrange for their reconstruction; although James acquired the chests he admits he never turned them over.[55] As evidence, Mosler and O'Tool cite to James's answers to interrogatories, Mosler's deposition, an April 22, 2004 message from James to Mosler, James's deposition, and an April 28, 2004 expenses message from James to Mosler.[56] Mosler asserts he paid a craftsman and friend of James, to whom James directed Mosler, funds for the round tables;[57] the craftsman never did the work or reimbursed the funds.[58] For this, Mosler and O'Tool cite as evidence James's interrogatories, James's deposition, and an affidavit by Mosler.[59] Mosler also contends, citing to his own deposition, he gave funds to James to cover expenses in Denmark and that James never produced documentation to back up "over $60,000" of expenditures he claimed he made with the funds.[60]

¶25    Mosler argues that because of the nonproduction of the items, nonavailability of James, lack of follow-through with the craftsman, lack of reimbursement for funds paid, and lack of accounting by James, he ceased to move forward with the production of the other furniture pieces.[61] It is Mosler and O'Tool's position that summary judgment for O'Tool is appropriate because by James's own admission, O'Tool was not party to the contract.[62] Further, they state summary judgment for Mosler is appropriate because James's actions, or rather his lack of taking any actions, constitutes breach of contract by nonperformance and that Mosler's cancelling of the contract was appropriate because James's repudiated his duty to provide the chests, to follow-up with his selected workman regarding the tables, and to account for his costs.[63]

¶26    James in his Opposition states that Mosler falsely represented that he had authority to redecorate the hotel and cites to the deposition of the majority hotel owner, Paul Saunders ("Saunders"), where Saunders states he made the decisions on whether to redecorate.[64] James also states that the number of furniture pieces that would be reproduced was fourteen (14), citing to James's deposition and Mosler's deposition - where Mosler states he is "unsure" what the amount was and that it could have been fourteen (14).[65]

---

[54] Defs.' Mot. For Summ. J. 4-5; Defs.' Mot. For Summ. J. Ex. 4 Interrog. 3; Ex. 7 ¶¶ 2-3 (Affidavit of Warren Mosler).
[55] Defs.' Mot. For Summ. J. 5; Defs.' Mot. For Summ. J. Ex. 4; Ex. 5; Ex. 8.
[56] Defs.' Mot. For Summ. J. Ex. 2 145:15-18, 176:13-16 (Deposition of Warren Mosler); Ex. 4 Interrogs. 4, 12; Ex. 5; Ex. 6 191-92 (Deposition of Wayne James); Ex. 8.
[57] Defs.' Mot. For Summ. J. 5-6; Defs.' Mot. For Summ. J. Ex. 4; Ex. 6.
[58] Defs.' Mot. For Summ. J. 6. Defs.' Mot. For Summ. J. Ex. 7.
[59] Defs.' Mot. For Summ. J. Ex. 4 Interrog. 12; Ex. 6 199; Ex. 7.
[60] Defs.' Mot. For Summ. J. 6; Defs.' Mot. For Summ. J. Ex. 2 42: 10 - 43: 23 (Deposition of Warren Mosler).
[61] Defs.' Mot. For Summ. J. 6-7; Defs.' Mot. For Summ. J. Ex. 2.
[62] Defs.' Mot. For Summ. J. 7.
[63] Defs.' Mot. For Summ. J. 7.
[64] Pl.'s Opp'n 3; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 10 (Deposition of Paul Saunders).
[65] Pl.'s Opp'n 3. Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 35: 20-22 (Deposition of Wayne James); Ex. 5 147 (Deposition of Warren Mosler). The Court notes this number of furniture pieces is different from what was in James's original Complaint.

¶27     James further asserts he was to be paid ten percent (10%) of the redecoration cost, citing to his, Mosler, and O'Tool's depositions.[66] In the cited portions of the depositions, James states "the nature of the project is to get a percentage based on total expenditures";[67] O'Tool states that if James "intended to receive ten percent payment for his involvement" then it is his fault his agent did not produce the restored furniture;[68] and Mosler states "[i]f I recall, he would get his – the same 10 percent referred to elsewhere."[69] James further avers the cost of the redecoration project was $1,892,000.00, citing to a March 12, 2005 e-mail from himself to Mosler after the cancellation of both contracts.[70] Citing again to the March 12, 2005 e-mail, James contends that, at the time of the repudiation, James had identified all the pieces to be reproduced and "found craftsman" to do the work – the e-mail contains a settlement offer and estimates or costs for seventeen (17) different types of furniture as well as estimates or costs for ten (10) additional expenses, such as shipping.[71]

¶28     James declares in his Response to Statement of Material Facts that he received "lots" of e-mails from Mosler indicating his desire to get the project started, and cites to his own deposition where he states he received many e-mails, although James did not produce any of these e-mails during discovery or in his Opposition to summary judgment.[72] James also contends that Mosler allowed a workman to stay at the hotel gratis and reimbursed his airfare, citing to that workman's deposition.[73] James alleges that Mosler cancelled the Hotel Refurbishment Contract in March 2005 without just cause in retaliation for James ending the Auction Contract.[74]

###     b.     Summary judgment will be granted in favor of O'Tool on the breach of the Hotel Refurbishment Contract.

¶29     Summary judgment in favor of O'Tool is appropriate here. Mosler and O'Tool assert that O'Tool was not party to the alleged Hotel Redecoration Contract. James merely alleges that she was party to the contract, although all the evidence provided shows only the possibility of a contract between Mosler and James. James states in his Response To Statement Of Facts And Counter Statement Of Material Facts that O'Tool could bind the hotel. In his assertion that O'Tool, through actions, represented that she had the authority to bind the hotel, James points to his deposition, in which he states: "I have lots of e-mails referring to, [l]et's get started with the project, and, yes, Mr. Worthman should come down and get started. Lots of emails back and forth between

---

[66] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 26: 12-13 (Deposition of Wayne James); Ex. 2 75: 6-8 (Deposition of Elizabeth O'Tool); Ex. 5 146 (Deposition of Warren Mosler).

[67] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 26: 12-13 (Deposition of Wayne James).

[68] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 2 75: 6-8 (Deposition of Elizabeth O'Tool).

[69] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 146: 8-9 (Deposition of Warren Mosler).

[70] Pl.'s Opp'n 3; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 12.

[71] Pl.'s Opp'n 4. Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 12. The Court notes this phrasing is unclear as to whether James found *a* craftsman or several crafts*men*.

[72] Pl.'s Opp'n 4; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 27-28 (Deposition of Wayne James).

[73] Pl.'s Opp'n 4; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 7 9:1-21 (Deposition of Jeffrey Worthman).

[74] Pl.'s Opp'n 4.

the entities that are relevant to this document, yes."[75] No e-mails are provided that show an exchange between James and O'Tool, only e-mails between Mosler and James. The citation provided by James to his deposition does not back up his assertion.

¶30    The other exhibit James points to for the assertion that O'Tool was involved in the Hotel Refurbishment Contract is the deposition of Mosler:

> Q: Now, were Mr. Sanders and Mr. Brandt aware of the fact that you were discussing with Mr. James a project to redecorate the hotel? A: Right. Now I didn't call it the redecoration project. What I wanted to do was invest in furniture, and I asked Paul if it's alright if I stored it in the hotel in the hotel room. Let guests use it, just have it there as investment furniture. He agreed that that would be okay.[76]

¶31    Neither of these mention O'Tool. Further, for the breach of contract claim, it is not at issue whether Mosler and O'Tool had the authority to bind the hotel, as the hotel is not the defendant in this case. This claim seeks to hold Mosler and O'Tool personally liable for a contract he alleges they made with him. The only other time James implicates O'Tool in the Hotel Redecoration Contract is when James asserts both Mosler and O'Tool reimbursed a craftsman's airfare. For this proposition he cites to the Worthman deposition: "A: I think we paid the airfare initially, and were reimbursed on our final bill. Q: Who reimbursed you? A: Warren and Elizabeth. Q: All right. And was your associate's airfare also paid? A: Yes. Q: In the same manner? A: Yes."[77]

¶32    Accepting this as true, it merely establishes O'Tool helped pay for a craftsman's airfare, not that she was bound to an oral contract made by Mosler with James to refurbish a hotel. James does not assert what his link is with this craftsman, what work the craftsman was doing for the alleged contract, or that this craftsman was a part of the alleged contract. Nor does James assert what duties or work O'Tool had under the alleged contract or otherwise what role she played in the alleged contractual agreement. In short, James provides no evidence as to what relationship O'Tool has with the business contract or with Mosler or James, nor does James indicate how she might otherwise be considered a principal or even an agent in this contract.

¶33    On the other hand, Mosler and O'Tool affirmatively show that James admits he made the agreement with just Mosler.[78] They also note that the e-mail produced from James that purportedly shows the existence of the contract was sent only to Mosler.[79] Thus, summary judgment will be granted in favor of O'Tool on James's Count I breach of contract claim regarding the Hotel Refurbishment Contract and Count I will be dismissed as to O'Tool.

---

[75] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 27: 19-23 (Deposition of Wayne James).

[76] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 139: 24 – 140: 7 (Deposition of Warren Mosler).

[77] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 7: 13-21 (Deposition of Jeffrey Worthman).

[78] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts ¶ 4 *citing* Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 7.

[79] Defs.' Reply 2.

### c.    Summary Judgment in favor Mosler on this claim will be denied

¶34    Among the evidence and arguments provided, Mosler and O'Tool assert that the e-mail from James was a mere suggestion and no contract existed.[80] Mosler also pleads in the alternative that if there was one, it was a "piece by piece" agreement.[81] James and Mosler have both also established that James and craftsmen were paid money with an understanding they would provide, at the very least, chests and round tables for Mosler.[82] It is also shown that a craftsman visited the hotel and was reimbursed for travel and provided with living arrangements by Mosler.[83]

¶35    James pleads that the original agreement was to be completed by September 2004, but then another disputed contract was to take precedence.[84] James also asserts that the agreement was cancelled by Mosler in March of 2005, after the other disputed contract had begun.[85] Mosler contends he is discharged from any obligation if a contract did exist due to James's failure to deliver the items which payment had been made for.[86] James contends he was continuously performing on the contract and had done most of the groundwork.[87]

¶36    Viewing all the evidence in the light most favorable to the nonmoving party, there are genuine issues of material fact presented here, such as what the terms of the alleged contract were, whether it was a "piece by piece" arrangement or an agreement for a specific fourteen (14) piece set, when delivery of the items was to be completed by, and whether James was performing or failed to perform under the agreement. Therefore, summary judgment against James and for Mosler on this claim is inappropriate as there exist genuine issues of material fact.

### 2.    Breach of the Auction Contract – Count II

### a.    Parties' claims and evidence regarding the Auction Contract

¶37    James's Complaint alleges that in May 2004, he informed Mosler and O'Tool that he was planning an antique auction in St. Croix and Mosler and O'Tool requested they be allowed to participate;[88] the parties agreed the auction would take precedence over the Hotel Refurbishment Contract and James would travel to Denmark to obtain items to sell;[89] the parties agreed to form a company called "Mahogany Auction" and open a bank account in that name and obtain credit authorization;[90] Mosler and O'Tool instead used "Mosler Auto Rentals'" credit and accounts;[91] James protested because it would "prevent customers from having a correct record of their

---

[80] Defs.' Mot. For Summ. J. 3-4; Defs.' Mot. For Summ. J. Ex. 5.
[81] Defs.' Mot. For Summ. J. 4; Defs.' Mot. For Summ. J. Ex. 2.
[82] Defs.' Mot. For Summ. J. 4-6; Defs.' Mot. For Summ. J. Ex. 4; Ex. 5; Ex. 6; Ex. 7; Ex. 8.
[83] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 7: 13-21 (Deposition of Jeffrey Worthman).
[84] Pl.'s Compl. ¶¶ 7, 8, 11.
[85] Pl.'s Opp'n 4.
[86] Defs.' Reply 3.
[87] Pl.'s Opp'n 4.
[88] Pl.'s Compl. ¶¶ 9, 10.
[89] Pl.'s Compl. ¶ 11.
[90] Pl.'s Compl. ¶ 13.
[91] Pl.'s Compl. ¶ 14.

transaction and who was actually getting paid";[92] the parties agreed to split the profit one-third (1/3) each way and sell any unsold items at a future auction;[93] James expected the auction to be a yearly event;[94] the furniture was purchased, shipped, and moved through customs in James's name;[95] and the auction was held February 12 and 13, 2005, and netted approximately $800,000.[96]

¶38     James's Complaint further alleges that Mosler and O'Tool collected all the auction monies and failed to provide an accounting;[97] Mosler and O'Tool "improperly attempted to take a large amount of cash from the sales" and used it to take an allegedly doctored photo, claiming it was the money the Governor of the Virgin Islands paid and that "in breach of confidentiality requirements" Mosler and O'Tool sent it out by e-mail to numerous persons and the press.[98] James claims that the taking of this photo "shocked and dismayed" him;[99] the photo damaged his reputation by causing people to believe there might be a hidden camera at the auction and that their purchases at auctions with James might be publicized;[100] and that James told Mosler and O'Tool he did not want to be involved in the auction business with them anymore.[101]

¶39     Mosler and O'Tool cite to James's interrogatory answer in which James states that the agreement for the Auction Contract was between Mosler and James, not O'Tool.[102] Mosler and O'Tool also cite to Mahogany Auction records and O'Tool's affidavit to show that Mosler advanced $731,115.30[103] of his own funds over ten (10) months for the auction, including funds sent to James so he could travel to Denmark and purchase items;[104] the auction was held on February 10 and 11, 2005[105] and netted $536,481.00[106] in proceeds;[107] the Government of the Virgin Islands agreed to purchase $96,030.00 worth of items and the West Indian Company agreed to purchase $57,750 worth of items and that neither paid for the purchases at the time.[108] Mosler and O'Tool cite to Mosler's affidavit to show that Governor Turnbull contacted James and made

---

[92] Pl.'s Compl. ¶ 15.

[93] Pl.'s Compl. ¶ 16.

[94] Pl.'s Compl. ¶ 17.

[95] Pl.'s Compl. ¶ 18.

[96] Pl.'s Compl. ¶ 19.

[97] Pl.'s Compl. ¶ 20.

[98] Pl.'s Compl. ¶ 21.

[99] Pl.'s Compl. ¶ 22.

[100] Pl.'s Compl. ¶ 23.

[101] Pl.'s Compl. ¶ 24.

[102] Defs.' Mot. For Summ. J. 8-9; Defs.' Mot. For Summ. J. Ex. 4 Interrog. 2.

[103] The number in O'Tool's affidavit which is cited as proof is instead $731,115.70, while the number O'Tool provides in her exhibits is the number quoted above. Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[104] Defs.' Mot. For Summ. J. 9; Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[105] These dates differ from the ones provided by Plaintiff. Exhibits attached with O'Tool's deposition indicate auction records for February 12, 2005 as well.

[106] The number in O'Tool's affidavit which is cited as proof is instead $536,486, while the number provided in her exhibits is the number provided above. Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[107] Defs.' Mot. For Summ. J. 9; Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[108] Defs.' Mot. For Summ. J. 9; Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

arrangements to buy $39,000.00 of additional furniture in cash.[109] Additionally, citing to O'Tool's affidavit and Mahogany Auction records, they state there were unsold items worth a total cost of $232,345.28 – although the exhibits show a slightly higher number.[110] The number is the total cost of the purchase prices plus the restoration costs for the unsold lots.[111]

¶40     Mosler and O'Tool further contend, pointing to Mosler's affidavit, that James delivered the money from Governor Turnbull to them in a red bag which was used for gifts from the Governor's inauguration.[112] Mosler states he was shocked and took a photo which he e-mailed to a few friends.[113] As evidence, Mosler cites to his own affidavit as well as provides the e-mail, which was sent to "AVMTraders" and a "Bill Mitchell" and states "thought you'd get a kick out of the attached picture – the gov. paid for his furniture he purchased for $39,000 from us for himself in cash. Note the bag it came in."[114] In his affidavit Mosler states he sent the e-mail to several friends and does not know how the newspaper got it.[115]

¶41     Mosler and O'Tool provide the newspaper article, titled "Cash purchase of items raises eyebrows," and they further contend that this shows the photo's newsworthiness.[116] Mosler and O'Tool provide another article titled "James: Mosler no longer part of even"[sic] where James both defends the cash payments and claims the disclosure violated the confidentiality of the auction and Mosler and O'Tool allege he affirmatively stated on March 5, 2005, that he was no longer part of the Auction Contract.[117] The newspaper article also states that Mosler had e-mailed the photo to his friends, not the newspaper.[118] Mosler and O'Tool state that after publicly terminating the contract, James sent invoices to the Government and the West Indian Company and collected the funds from them although he was not in possession of the furniture, and they provide the invoices sent by James although no dates appear on the invoices.[119]

¶42     Mosler and O'Tool further show by citing to James's own answers to interrogatories that James deposited these funds into a bank account in Washington, D.C.[120] They also state that James never provided an accounting, except to show he spent $14,217.01 on a customs bill, and that he received $139,562.99 from the Government and a $20,000.00 advance, pointing to his answers to the interrogatories, his deposition, and Mosler's affidavit, although the latter document does not contain an accounting of funds James's received in connection with the auction.[121] Mosler and O'Tool also assert that, after James terminated the contract, he again refused to provide an

---

[109] Defs.' Mot. For Summ. J. 9; Defs.' Mot. For Summ. J. Ex. 7 (Affidavit of Warren Mosler).

[110] This number differs from what is provided in the exhibits which is $232,375.48. Defs.' Mot. For Summ. J. 9; Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[111] Defs.' Mot. For Summ. J. Ex. 3 (Affidavit of Elizabeth O'Tool and accompanying records).

[112] Defs.' Mot. For Summ. J. 10; Defs.' Mot. For Summ. J. Ex. 7 ¶7 (Affidavit of Warren Mosler).

[113] Defs.' Mot. For Summ. J. 10.

[114] Defs.' Mot. For Summ. J. 10; Defs.' Mot. For Summ. J. Ex. 7 ¶7 (Affidavit of Warren Mosler); Ex. 10.

[115] Defs.' Mot. For Summ. J. Ex. 7 ¶7 (Affidavit of Warren Mosler).

[116] Defs.' Mot. For Summ. J. 10; Defs.' Mot. For Summ. J. Ex. 11.

[117] Defs.' Mot. For Summ. J. 10; Defs.' Mot. For Summ. J. Ex. 12.

[118] Defs.' Mot. For Summ. J. Ex. 12.

[119] Defs.' Mot. For Summ. J. 10-11; Defs.' Mot. For Summ. J. Ex. 6; Ex. 13.

[120] Defs.' Mot. For Summ. J. 11; Defs.' Mot. For Summ. J. Ex. 4 Interrogs. 5, 6.

[121] Defs.' Mot. For Summ. J. 11; Defs.' Mot. For Summ. J. Ex. 4 Interrogs. 4, 6, 7; Ex. 6 108: 7-14, 133-34 (Deposition of Wayne James); Ex. 7 (Affidavit of Warren Mosler).

accounting, citing to both of their affidavits.[122] Mosler and O'Tool contend that they cannot be held liable for breach of contract because James is not entitled to damages because it was James who terminated the agreement, and that James has already received $159,562.99, which exceeds the one-third profit he claims he was entitled.[123]

¶43    Mosler and O'Tool contend that even without James's accounting, it is undisputed Mosler spent $731,115.30, that $690,261.00 was received in total from the auction (the $536.481 received from the auction days plus the $39,000.00 from Governor Turnbull later and the $153,780.00 received from the Government and West Indian Company), that James received the $153,780 and the unsold furniture amounted to $232,375.48, for a grand total of $922,636.48.[124] Subtracting this amount from the amount spent results in $191,521.78 in profit, one-third (1/3) of which is $63,890.39, far less than the amount James testified he received.[125] Thus, Mosler and O'Tool argue, James cannot establish damages. Therefore, Mosler and O'Tool contend that summary judgment is appropriate because O'Tool was never a party to the contract, James breached first, and James suffered no damage.[126]

¶44    James replies that there was a written memorandum regarding the agreement between Mosler and O'Tool and cites to his own deposition, in which he claims there was a memorandum, although he never produced it and no other deposition is cited in support of this allegation.[127] James asserts he gave his receipts from his Denmark trip to O'Tool,[128] but then he also states that he purchased items from flea markets and antique shops where receipts "were not always available."[129] For this proposition James again cites to his own testimony, as well as an exhibit from March 1, 2005—after the auction—which apparently connects some wire transfers with some of the auction lot numbers.[130] James admits to receiving a $20,000.00 fee and further alleges that Mosler and O'Tool adversely impacted the profitability of the auctions by actively bidding while having knowledge of the lots' "reserve prices."[131] James cites to an "expert report" which he himself created for this proposition.[132] James asserts that Mosler and O'Tool breached the Auction Contract by never providing an accounting.[133]

¶45    James admits to receiving the money from the Government and the West Indian Company but says Mosler and O'Tool had agreed to open the storage area where the furniture was kept but

---

[122] Defs.' Mot. For Summ. J. 11-12; Defs.' Mot. For Summ. J. Ex. 3 ¶ 5 (Affidavit of Elizabeth O'Tool); Ex. 7 ¶ 8 (Affidavit of Warren Mosler).

[123] Defs.' Mot. For Summ. J. 12.

[124] Defs.' Mot. For Summ. J. 12-13.

[125] Defs.' Mot. For Summ. J. 13.

[126] Defs.' Mot. For Summ. J. 13.

[127] Pl.'s Opp'n 4; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 33:15-34:11 (Deposition of Wayne James).

[128] Pl.'s Opp'n 5; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 38: 4-9 (Deposition of Wayne James).

[129] Pl.'s Opp'n 5; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 39: 1-14 (Deposition of Wayne James).

[130] Pl.'s Opp'n 5; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1; Ex. 8.

[131] Pl.'s Opp'n 5.

[132] Pl.'s Opp'n 5. Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts 29-30.

[133] Pl.'s Opp'n 6.

then refused to do so.[134] Again, James cites to his own deposition testimony for this.[135] James also states that Mosler and O'Tool took possession of an item that Governor Turnbull paid for, and cites to Mosler, O'Tool's, and Governor Turnbull's depositions.[136] James also states that Mosler and O'Tool used some of the unsold lots in their own home.[137] James avers that the value of the seventy-two (72) unsold lots was $695,180.00, citing to his own deposition and the "expert report" James himself created, and that part of the Auction Contract was the value of the unsold lots would also be divided into one-third (1/3) shares.[138] James asserts he is due $230,000.00 from the unsold lots, $14,000.00 for the profits from the auction, and $14,000.00 reimbursement for the customs fee.[139]

¶46    Mosler and O'Tool point out that James admits he was the one who cancelled the contract and is attempting to use the "breach of confidentiality" argument to get around the fact that he breached first.[140] They show, through newspaper exhibits, that James had publicized the auction in the local paper, had invited the local paper to cover the auction, the local paper published an article naming the bidders—including Governor Turnbull—and their purchases and Mosler and O'Tool cite to an outside expert who states that confidentiality of bidders at a public auction is virtually impossible to maintain.[141] They also point out that the other arguments James relies on: (1) that Mosler and O'Tool kept one of Governor Turnbull's furniture pieces; (2) the lack of a final accounting (which they point out cannot be completed until James provides financial information); and (3) that Mosler and O'Tool used some of the furniture—cannot be a basis for breach of contract because it happened after James had already terminated the Auction Contract.[142]

¶47    Mosler and O'Tool also indicate in their Reply that: (1) James has never provided proof of the alleged customs bill he spent $14,217.01 on; (2) James admits to receiving and putting $153,780.00 into his bank account; and (3) by his own admission the auction only made $40,000 in profits[143] for which James would only be entitled to $13,333.33.[144] Mosler and O'Tool point out that James, as his own expert, asserts that he is entitled to the cost of the unsold lots valued at their reserve price, which he unilaterally assigned to the lots.[145] Mosler and O'Tool cite to their outside expert who indicates that: (1) James valued these objects with no accepted methodology; (2) his valuation "is not an accurate valuation of the items in question"; (3) that the figure is "conveniently" three (3) times the purchase price; (4) there is no account of any anticipated cost in selling the items; and (5) the figure is in excess of the opening price – that is, higher than the

---

[134] Pl.'s Opp'n 6.
[135] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 111:20-112:7 (Deposition of Wayne James).
[136] Pl.'s Opp'n 6; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts 25.
[137] Pl.'s Opp'n 6.
[138] Pl.'s Opp'n 6-7; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts 25; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 122: 15-19 (Deposition of Wayne James); Ex. 9.
[139] Pl's Opp'n 7-8.
[140] Defs.' Reply 4-5.
[141] Defs.' Reply 5. Defs.' Mot. For Summ. J. Ex. 17; Ex. 22.
[142] Defs.' Reply 6.
[143] Pl.'s Opp'n 7.
[144] Defs.' Reply 6-7.
[145] Defs.' Reply 6-7.

amount James originally tried to sell them for.[146] Mosler and O'Tool assert the fair market value of the unsold furniture is, instead, its cost: $232,345.78,[147] that one-third (1/3) of that sum is $74,115.40, and adding the one-third (1/3) profit from the auction of $13,333.33, James would be owed $87,448.73, far less than the $159,562.99 he has already pocketed.

### b. Summary judgment will be granted in favor of Mosler and O'Tool on the breach of the Auction Contract claim

¶48  In viewing the evidence in a light most favorable to James, there does appear to be a business agreement here between James, Mosler, and O'Tool. This arrangement appears to involve Mosler funding the auction, James acquiring the items and serving as auctioneer, and O'Tool managing the bookkeeping. However, the Court finds that James was the breaching party and did not suffer damages. Therefore, James cannot prove the last elements of a breach of contract claim. By James's own admission, he canceled the Auction Contract – even stating in his Complaint that he told Mosler and O'Tool he no longer wanted to conduct the auction business. In an effort to overcome this, James then asserts that the taking of the photo of Governor Turnbull's money was the actual breach of the contract, as it breached "bidder confidentiality," but James can only point to his own self-serving statements in support of this argument.

¶49  There is no evidence "bidder confidentiality" constituted a material term of the contract or that a breach of "bidder confidentiality" constitutes a breach of an auction contract. This assertion and conclusion in James's self-serving deposition and self-created "expert report" appears custom-tailored to get around James's repudiation of the Auction Contract. Meanwhile, Mosler and O'Tool provide evidence that the auction was reported in the local paper and that James used the same paper to publicize the event. Defendants also provided a newspaper article covering the first day of the auction which extensively reported on the purchases and covers Governor Turnbull's presence and participation, including what items he purchased, what the starting bids were, and how much he paid for them.[148]

¶50  Further, Defendants provided an outside expert who testifies that "bidder confidentiality" is nearly impossible to maintain in a public auction. Juxtaposing James's self-serving testimony and "expert report" (which is in effect little more than an unsworn affidavit) claiming a breach due to violations of "bidder confidentiality" in a public auction the press was invited to and reported on, with the evidence provided by Mosler and O'Tool as well as James's own admissions, no reasonable factfinder could find that Mosler and O'Tool repudiated the contract because of a "bidder confidentiality breach" prior to James's self-admitted refusal to continue with the Auction Contract. Further, no refusal to turnover to third parties certain items can constitute a breach as

---

[146] Defs.' Reply 7. Defs.' Mot. For Summ. J. Ex. 22; Ex. 25.

[147] This number appears to be a typing error, as in their Motion For Summary Judgment the exhibits show an amount of $232,375.48. *See supra* note 110.

[148] Defs.' Mot. For Summ. J. Ex. 17 ("Turnbull, well-known as an avid antiques collector, outbid others for the a [sic] pair of armchairs that was used in officer's salon in [sic] barracks of the Danish military in Charlotte Amalie. Bidding for the chairs began at $3,000. Turnbull outbid others at $9,000. He also bid for and won a drop-leaf table used by St. Croix newspaper publisher Paul E. Joseph in the 1940s. He bid up to $5,100.").

these occurred later. Lastly, any failure to provide an accounting not only occurred after the breach but was precipitated by James's refusal to provide the relevant information.

¶51     Even assuming there was a breach of the contract by Mosler and O'Tool, James cannot show monetary damages. James asserts: (1) damages of $14,000.00 from a Customs bill he has said he paid but has not produced evidence of; (2) $13,333.00 in profits from the auction; and (3) $230,000.00 from his own valuation of the unsold lots, contained in an "expert report" he made himself. James admits to receiving and depositing the checks from the Government and from the West Indian Company in addition to being paid a $20,000 fee. Mosler and O'Tool provide evidence from an outside expert that James's valuation is erroneous, self-serving, and not based on any methodology. James's valuation simply increases by three times what he paid for the items, notably in excess of what he intended to sell them for. The Court also notes that because of his one-third (1/3) interest, by arbitrarily multiplying the value of the lots by three (3), James is seeking to recover the total cost value of the unsold lots.

¶52     Even accepting that the customs' bill may exist and subtracting that amount from what James received, comparing James's self-serving deposition and self-made "expert report" with that of the evidence provided by Mosler and O'Tool, it is clear that James is merely pleading inflated numbers to show nonexistent damages. While there appears to be a dispute as to the value of the unsold lots, James's "expert report" is functionally unsworn self-serving statements. Contrasting this evidence with that provided by Mosler and O'Tool, a rational factfinder would not find it credible. The amount of money James could expect from splitting the auction profits and the total cost of the unsold lots by one-third (1/3) is far below the money James received in depositing the Government's and West Indian Company's payments in his Washington, D.C. bank account. Therefore, even if James could show a breach of contract, he cannot show damages. Summary judgment on Count II will be granted in favor of Mosler and O'Tool and Count II will be dismissed.

### B.     James's misrepresentation claim – Count III

#### 1.     Parties' claims and evidence regarding misrepresentation

¶53     In his Complaint, James alleges that he relied on Mosler and O'Tool's "reputations that they would pay expenses such as the custom bill, that they would conduct the auction in a professional and ethical manner, and that they would provide furniture to the persons who purchased it."[149] He argues the Defendants' alleged actions:  (1) harmed his reputation; (2) prevented him from ever conducting an auction again; (3) resulted in his debt to Customs and failure to pay it harms his reputation; (4) made it look as if he neglected to provide the Government with furniture and this harms his reputation: and (5) made it appear as if he participated in a contrived photo which results in harm to his reputation.[150]

¶54     Mosler and O'Tool point out in their Motion For Summary Judgment that damage to "reputation" is not compensable as damages for misrepresentation, only pecuniary damage.[151]

---

[149] Pl.'s Compl. ¶ 47.
[150] Pl.'s Compl. ¶¶ 48-52.
[151] Defs.' Mot. For Summ. J. 14.

Mosler and O'Tool also state that the "gist of the action" doctrine bars a plaintiff from bringing a tort claim that merely replicates a claim for breach of an underlying contract.[152]

¶55     James responds in his Opposition with new theories of misrepresentation; the first being that Mosler and O'Tool falsely represented that they had the authority to bind the hotel in a contract.[153] James cites to his own deposition, and a statement in Mosler's deposition where Mosler states he discussed with Saunders and another hotel owner about investing in furniture and keeping it in the hotel and that they stated that would be okay.[154] James then states he only learned after the initiation of the lawsuit that they did not have such authority.[155] James asserts Mosler and O'Tool knew their misrepresentation was false, that they made the misrepresentation with knowledge that James would rely on the statement, that James did rely on the statement in expending time and money to redecorate the hotel, and the value of that work was $180,000.[156] James provides no citations or evidence for these claims.

¶56     Next, James argues that Mosler and O'Tool made other intentional misrepresentations; one being that they agreed they would split the net profits by one-third (1/3). James provides no support for this. He then states that any unsold furniture would be sold in a subsequent auction.[157] James cites to his own deposition, as well as the deposition of Mosler in which he states the agreement was that they would procure furniture, bring it up to museum quality, and sell it with one-third (1/3) of the profits going to James, one-third (1/3) going to a clinic in Frederiksted, and one-third (1/3) going to a museum in Frederiksted.[158] James then states the value of the unsold lots was $695,180.00 and that James was entitled to one-third (1/3) of this.[159] James cites to his own deposition and the "expert report" he created to support this. James further avers, with no corroboration, that Mosler and O'Tool never intended to sell these lots and instead used them in their home.[160]

¶57     James also alleges that Mosler and O'Tool represented that O'Tool would be responsible for the accounting and in reliance of this he turned over receipts to O'Tool; O'Tool did not account for those receipts or provide James with a copy, and thus he is unable to properly account for expenses.[161] James cites to his own deposition as well as a March letter titled "Reconciliation of Lot Numbers with Wire Transfers."[162]

¶58     James then argues that Mosler and O'Tool made misrepresentations by representing they wanted to join James in an auction business "and would participate in that business in an ethical

---

[152] Defs.' Mot. For Summ. J. 15.

[153] Pl.'s Opp'n 8.

[154] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 139:24 – 140:7 (Deposition of Warren Mosler).

[155] Pl.'s Opp'n 8.

[156] Pl.'s Opp'n 8-9.

[157] Pl.'s Opp'n 9.

[158] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 109:22 – 110:3 (Deposition of Warren Mosler).

[159] Pl.'s Opp'n 9.

[160] Pl.'s Opp'n 9.

[161] Pl.'s Opp'n 9-10.

[162] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 8.

and professional manner and split the profits one-third each." James again cites to his own deposition and the deposition of Mosler in which Mosler states one-third (1/3) of the profits would go to a clinic and one-third (1/3) to a museum.[163] With no citation, James alleges Mosler and O'Tool did not really "intend to do so" and James charges that Mosler and O'Tool acted unethically by bidding on items which they knew the reserve price on.[164] James cites to his self-made "expert report" for this.

¶59     Moreover, James states Mosler and O'Tool unethically violated the duty of confidentiality and disclosed what items at the auction Governor Turnbull bought by staging a photo and sending it out.[165] James cites to his own "expert report" and deposition, as well as the deposition of O'Tool in which she states that the photo did get sent somehow to the newspaper, although not that she or Mosler sent it.[166] James states these actions ruined the reputation of the auction putting it out of business and ruined his reputation.[167] James again cites to his own deposition and his self-made "expert report" as evidence for this claim.

¶60     Lastly, James states that Mosler and O'Tool represented they would set up a credit card account for the auction company but they never really intended to and that James "relied on those representations to his determent [sic]."[168] James cites to his deposition as well as the depositions of Mosler and O'Tool in which they indicate that James had asked them to set up a credit account but Mosler did not want to because it would add expenses.[169] He also asserts that cash was taken by Mosler and O'Tool that was not accounted for; and that all these "material misrepresentations" damaged his reputation and hurt him economically.[170]

¶61     In their Reply, Mosler and O'Tool argue that because James has not responded to either of their two arguments—that reputation damages are not actionable under a misrepresentation theory and that James's allegations are merged into the contract claim—James has conceded these two arguments.[171] Mosler and O'Tool also contend that the points James does make are irrelevant or untrue: 1) it does not matter whether Mosler or O'Tool misrepresented that they could bind the hotel as the hotel is not a defendant and James asserts he had a contract with Mosler not the hotel; 2) James's assertion that Mosler and O'Tool acted "unethically" is based on his own expert report and refuted by their expert, James was in control of the auction and bidding and did not prohibit

[163] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 109:22 – 110:3 (Deposition of Warren Mosler).

[164] Pl.'s Opp'n 10.

[165] Pl.'s Opp'n 10.

[166] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 2 51:19-23 (Deposition of Elizabeth O'Tool).

[167] Pl.'s Opp'n 10-11.

[168] Pl.'s Opp'n 11.

Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 3 30-31 (Deposition of Elizabeth O'Tool); Ex. 5 99 (Deposition of Warren Mosler).

[170] Pl.'s Opp'n 11.

[171] Defs.' Reply 8-9. Mosler and O'Tool cite to: *Day v. C.C. Dep't of Consumer & Regulatory Affairs*, 191 F. Supp. 2d 154, 159 (D.D.C. 2002) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *Bancoult v. McNamara*, 227 F. Supp. 2d 144, 149 ("[I]f the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded . . . .").

Mosler and O'Tool from bidding, and most importantly, the claim is irrelevant to the tort of "misrepresentation"; and 3) while James pleads he is prevented from holding future auctions by damage to his reputation, he has provided no evidence he has attempted or intended to do so, and James has enjoyed favorable press coverage of his antique collection since.[172]

### 2. Summary judgment will be granted in favor of Mosler and O'Tool on the misrepresentation claim

¶62     All of James's original damages claimed in his Complaint are damages to his reputation. Misrepresentation requires that the plaintiff plead pecuniary damages. James has not done so and is thus unable to recover under a theory of misrepresentation. Insofar as James alleges new theories in his Opposition, these are not properly before the Court, as "new theories require new complaints and a plaintiff may not amend his complaint via arguments made in opposition to a summary judgment motion."[173] However, for the purposes of judicial economy, the Court will exercise its discretion and consider James's new arguments.

¶63     James alleges that Mosler and O'Tool misrepresented to him that they had the authority to bind the hotel to a contract, and that in reliance on this James performed work which he valued at $180,000.00. However, not only is the hotel not a party to the case or the contract—James himself admits he made the contract with Mosler—this allegation simply duplicates James's breach of contract claim for the Hotel Refurbishment Contract and is thus barred by the gist of the action doctrine. James alleges that Mosler and O'Tool misrepresented to him they would conduct an accounting, but James has not alleged with particularity what pecuniary loss was suffered, or what James has lost and Mosler and O'Tool have gained from this. Further, as discussed below, it is Mosler and O'Tool who seek an accounting from James and it is James who has stymied their efforts by failing to provide access to certain bank statements or other documents.

¶64     James's arguments that Mosler and O'Tool acted unethically and that they fraudulently misrepresented they would act professionally again fails to show what James has lost and Mosler and O'Tool have gained through the alleged misrepresentation. While James, citing himself, states without explanation that Mosler and O'Tool's bidding drove profits down, Mosler and O'Tool state that their bidding caused sales to increase, driving profits up. Additionally, Mosler and O'Tool indicate that James was in charge of the auction, and at no point until the filing of his Opposition did he express it was improper for them to bid at the auction nor did James try to prevent them from bidding at the auction. Further, they provide evidence from their expert that their actions in bidding were not improper.[174] Unable to plead pecuniary loss with specificity,

---

[172] Defs.' Reply 10.

[173] *In re: Gen. Instrument Corp. Secs. Litig.*, No. 96 C 1129, 2000 U.S. Dist. LEXIS 17082, at *10 (N.D. Ill. Nov. 21, 2000); *cf. Jefferson v. Chase Home Fin.*, NO. C 06-6510 THE, 2008 U.S. Dist. LEXIS 101031, at *16 (N.D. Cal. Apr. 29, 2008) ("A more accurate statement of the law, however, is that a court has discretion to refuse to allow a new theory in opposition to summary judgment."); *see also Xpertuniverse, Inc. v. Cisco Sys.*, No. 09-157-RGA, 2013 U.S. Dist. LEXIS 32711, at *35 (D. Del. Mar. 8, 2013) ("XU's new theories in opposition to summary judgment are untimely and not supported by any record evidence; it is unclear what 'business opportunities' XU is even alleging. One reasonable conclusion is that XU proposed these new theories to survive summary judgment, as opposed to in response to the natural course of litigation and discovery.").

[174] Defs.' Response To Pl.'s Counterstatement Of Material Fact Ex. 22 ("It should not be considered improper Mosler and O'Tool were acting as bidders, not auction house principles at a public auction, as was the Governor. A Public

affirmatively show that Mosler and O'Tool enticed James by representations of ethical behavior, or to show that Mosler and O'Tool acted unethically in misrepresentation to James, James's alleged claim of misrepresentation here must fail.

¶65     For similar reasons, James's allegations of fraudulent misrepresentation involving the photo taken by Mosler and O'Tool must fail. James asserts his reputation was harmed and that of the auction, but he offers no evidence for this and reputational harm is not actionable under the tort of fraudulent misrepresentation. Further, James does not even allege he attempted to hold an auction again and was rebuffed. A barebone statement of conclusory harm without a scintilla of evidence cannot survive summary judgment. Lastly, this allegation merely reiterates James's breach of contract claim. Summary judgment in favor of Mosler and O'Tool is appropriate regarding James's claim that they fraudulently misrepresented they would act ethically and breached this by taking a photo of cash payments.

¶66     James's final assertions of fraudulent misrepresentation regarding funds and how the auction finances would work also does not survive summary judgment. James does not indicate how not setting up a new crediting account harmed him. Apparently in response to Mosler and O'Tool's Motion For Summary Judgment's argument that reputational harm is not actionable, he blanketly asserts that he was harmed economically, but offers no evidence. Nor does his claim that Mosler or O'Tool stole cash from him constitute fraudulent misrepresentation – he does not allege how, through an intentional misrepresentation, they caused him to act or not act with regards to purportedly stolen cash. Even more importantly, he does not provide any evidence that cash was stolen nor does he give any details, such as how it was stolen or how much was taken. This baseless accusation is not plead with particularity or backed up by any evidence uncovered during discovery.

¶67     With all these claims, James attempts to revive his breach of contract arguments under a different theory of tortious liability. Recognizing that his original Complaint was legally defective in alleging only reputational harm, he tacks on a conclusory declaration he was also harmed economically. Both legally and factually, James has failed to show fraudulent misrepresentation or circumstances that differ this claim from his breach of contract claims. Summary judgment in favor of Mosler and O'Tool will thus be granted and Count III will be dismissed.

### C.     James's claim of fraud – Count IV

#### 1.     Parties' claims and evidence regarding fraud

¶68     James states in his Complaint that Mosler "has a pattern and practice of making business promises that he has no intention of fulfilling";[175] that Mosler entered into agreements with James

---

Auction is open to all . . . . There is no mention that to be actively engaged in the auction, and bidding on items while holding the reserve price list, is contrary to the auction house rules . . . . Similar to limiting conditions auction house "rules" should state the use of any restrictions for bidders. As described above, unless the auctioneer or auction house states clearly that they (Mosler & O'Tool), were under restrictive limiting conditions and have the reserve price list they will not be allowed to participate in the auction. If that is not specified then it remains an open auction to all participants in attendance including those given the advantage of holding a reserve price list.").
[175] Pl.'s Compl. ¶ 54.

that Mosler did not intend to fulfill and that he is guilty of fraud;[176] and that as a result James suffered damages of "loss of reputation, mental anguish, physical and psychological injuries, pain and suffering and loss of enjoyment of life[.]"[177]

¶69    Mosler and O'Tool state that James "has failed to identify any such promises on any business entity which claims that such promises were made and not fulfilled."[178] Mosler and O'Tool, citing to James's interrogatory answers and deposition, point out that James has never seen a doctor for the alleged physical injuries, and he has not seen a psychiatrist or psychologist for his alleged mental and psychological injuries.[179] They also point out that fraud and misrepresentation have the same elements, and thus James can only sue for monetary damages.[180] They further argue that beyond James not being able to demonstrate physical harm, any physical harm done from a misrepresentation of fact must be reasonably anticipated.[181] Mosler and O'Tool also assert that the "gist of the action" doctrine bars James's fraud claim as well.[182]

¶70    In his Opposition, James states that there are "multiple instances of fraud in the instant case."[183] As with elsewhere in his Opposition, James asserts new theories and damages not alleged in his Complaint. First, James again asserts that Mosler and O'Tool falsely represented they had authority to bind the hotel to a contract.[184] Again, James cites to the depositions of James, Mosler, and Saunders.[185] In those depositions, Saunders states that Mosler had a twenty-four-and-a-half percentage (24.5%) interest in the hotel; Saunders was in charge of final decisions, such as redecorating the hotel; that Mosler would frequently come to him for decisions; and that they decided not to refurbish the whole hotel with mahogany furniture.[186] James leaves out that Saunders did agree to retiling and refurbishing one of the rooms with mahogany furniture.[187] In Mosler's deposition, he states he did not have a written agreement with hotel management concerning the redecoration; that he did not call it a redecoration but an investment in furniture; and he wanted to store it at the hotel and let guests use it.[188]

¶71    Next, James insists Mosler and O'Tool defrauded him by stating they would permit the Government to pick up furniture but then refused to hand it over.[189] James does not provide a citation for this, but he does cite to his own deposition for his following assertion that the

[176] Pl.'s Compl. ¶¶ 55-56.
[177] Pl.'s Compl. ¶ 57.
[178] Defs.' Mot. For Summ. J. 16.
[179] Defs.' Mot. For Summ. J. 16.
[180] Defs.' Mot. For Summ. J. 16-17.
[181] Defs.' Mot. For Summ. J. 17.
[182] Defs.' Mot. For Summ. J. 17.
[183] Pl.'s Opp'n 12.
[184] Pl.'s Opp'n 12.
[185] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 27:19-23 (Deposition of Wayne James); Ex. 5 139:24-140:7 (Deposition of Warren Mosler); Ex. 10 45:14-25 47:8-25 (Deposition of Paul Saunders).
[186] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 10 45:14-25 47:8-25 (Deposition of Paul Saunders).
[187] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 10 48:1-10 (Deposition of Paul Saunders).
[188] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 5 139:24-140:7 (Deposition of Warren Mosler).
[189] Pl.'s Opp'n 12.

Government and West Indian Company paid for the furniture with checks made out to Mahogany Auction, which were deposited in his account.[190] Again citing to his own deposition, James states that Mosler and O'Tool agreed to open the storage area for the Government on May 9, 2005, but then refused to give the Government the furniture until they paid him directly.[191]

¶72    Third, James states that the parties agreed that Mosler and O'Tool would open a bank account in the name Mahogany Auction and obtain credit authorization in that name.[192] James cites to Mosler's, O'Tool's, and his depositions, although, as pointed out above, Mosler and O'Tool assert that James had merely asked them and they refused to set up the accounts as it was an unnecessary added expense.[193] James asserts that Mosler and O'Tool instead used "Mosler Auto Rentals'" accounts and that James objected that this was improper.[194] Without any citation, James proclaims that O'Tool and Mosler acted with fraudulent intent in their refusal to set up a new bank account, and that they were thus able to siphon funds from the auction into their personal accounts.[195]

¶73    Fourth, James alleges that seventy-two (72) lots did not sell at auction and he values these items at $695,180.00, citing his own expert report.[196] James alleges that Mosler and O'Tool put the unsold lots in their homes, citing to Mosler and O'Tool's depositions.[197] He further states that the value of the unsold lots would be split into thirds (1/3) and distributed, citing to Mosler and James's depositions.[198] Next, James alleges that Mosler and O'Tool took possession of Item 42, which was paid for by Governor Turnbull, and that Mosler and O'Tool knew this.[199] James cites to O'Tool, Mosler, and Turnbull's depositions.[200]

¶74    Lastly, James asserts that Mosler and O'Tool collected all monies from the auction and have failed to provide an accurate accounting, citing to his own deposition.[201] James asserts by failing to provide an accounting, Mosler and O'Tool are attempting to defraud James out of the

---

[190] Pl.'s Opp'n 12; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 113:1-114:2 (Deposition of Wayne James).

[191] Pl.'s Opp'n 12; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 111:20-112:7, 113:1-114:2 (Deposition of Wayne James).

[192] Pl.'s Opp'n 12.

[193] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 102:22-105:22 (Deposition of Wayne James); Ex. 3 30-31 (Deposition of Elizabeth O'Tool); Ex. 5 99 (Deposition of Warren Mosler).

[194] Pl.'s Opp'n 12-13.

[195] Pl.'s Opp'n 13.

[196] Pl.'s Opp'n 13; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 9.

[197] Pl.'s Opp'n 13; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 2 101-102 (Deposition of Elizabeth O'Tool); Ex. 4 70:17-18, 76:1-3 (Deposition of Warren Mosler).

[198] Pl.'s Opp'n 13; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 123:4-8 (Deposition of Wayne James); Ex. 5 109:22-110:3 (Deposition of Warren Mosler).

[199] Pl's Opp'n 13.

[200] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 2 103 (Deposition of Elizabeth O'Tool); Ex. 5 15:23-16:9 (Deposition of Warren Mosler); Ex. 6 37:4-12 (Deposition of Governor Turnbull).

[201] Pl.'s Opp'n 13; Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 67:16-20 (Deposition of Wayne James).

value of the unsold lots and his one-third (1/3) in profits.[202] James ends his Opposition with a blanket assertion he has thus been harmed reputationally and economically.[203]

¶75    Mosler and O'Tool reply that James "did not even respond to the point that he had not provided any evidence to support his only allegation of fraud in the [C]omplaint" namely that Mosler "has a pattern and practice of making business promises he has no intention of fulfilling."[204] Mosler and O'Tool point out that James still has not proven any physical or emotional injury, and that he has added several new accusations not contained in his Complaint or in any responses to discovery.[205] Among these, are accusations that Mosler misrepresented his interest in the hotel, which Mosler and O'Tool characterize as "irrelevant," and another accusation they call both false and irrelevant – that Mosler promised the Government it could pick up furniture then refused to let it do so.[206] Finally, Mosler and O'Tool further argue that even if these new allegations were allowed, they are just a part of James's alleged contract claims and would also be barred by the "gist of the action" doctrine.[207]

### 2.    Summary judgment will be granted in favor of Mosler and O'Tool on the fraud claim

¶76    James has not plead with particularity or shown satisfactory evidence that Mosler and O'Tool have a history or "pattern" of making business promises which they intend not to fulfill. No evidence of other purportedly fraudulent business practices was provided nor were any even plead. Nor has James shown any physical harm from his stated fraud claim nor has he demonstrated what specific pecuniary loss James suffered and what pecuniary gain Mosler and O'Tool gained from this 'pattern of promises.' James's fraud claim is a broad and generalized accusation. The rest of James's theories are not properly before the Court as they arise in an opposition to a motion for summary judgment and James has not amended his Complaint. However, in the interest of judicial economy the Court will consider them.

¶77    As mentioned above, James stated he made the Hotel Refurbishment Contract with Mosler, not with the hotel.[208] James is suing Mosler, not the hotel, and he is not trying to add the hotel as a party. Nor does James plead with particularity what Mosler gained, and James lost, by James being led to believe Mosler could bind the hotel. Aside from being improperly before the Court, James has not plead fraud satisfactorily here. Even if he had, the claim mirrors James's assertions under his breach of contract claim and would be barred by the gist of the action doctrine.

¶78    Citing only to his own statements, James asserts Mosler and O'Tool agreed to open where they were keeping furniture for the Government but then refused to turn over the furniture. James does not assert what pecuniary loss he suffered from this and the Government is not a party to this action. Indeed, by James's own admission, James is the one who gained here as he pocketed the

---

[202] Pl.'s Opp'n 13-14.
[203] Pl.'s Opp'n 14.
[204] Defs.' Reply 10-11.
[205] Defs.' Reply 11.
[206] Defs.' Reply 11.
[207] Defs.' Reply 11.
[208] Defs.' Mot. For Summ. J. Ex. 4 Interrog. 2.

Government and West Indian Company's monies into his own bank account in Washington, D.C. regardless of whether the Government and West Indian Company received their furniture. James has not satisfactorily alleged a count of fraud here.

¶79    Nor has Plaintiff alleged fraud concerning the bank account. James states he deposited his funds into a bank account in Washington, D.C. under his name and a designation "d/b/a Mahogany Auctions." There is no indication of what pecuniary loss there was for James in Mosler or O'Tool not opening a new bank account. While James alleges that Mosler and O'Tool "siphoned funds" into their personal account he provides no evidence of this, nor does he provide particulars as to when, how much, or even what funds. Further, all the funds pointed to by the parties for the acquisition and purchase of the auction items originated with Mosler, with the exception of an alleged Customs bill which has not been produced. James has not satisfactorily alleged fraud here.

¶80    Likewise, James does not show how Mosler and O'Tool holding onto the unsold lots or an item purchased by Governor Turnbull constitutes fraud. There is no false representation of a material fact alleged here or any physical or monetary injury to James demonstrated. While James asserts his reputation was harmed, there is no pecuniary loss to James in Mosler and O'Tool holding on to the unsold lots, nor is it apparent how James's is monetarily harmed by Mosler and O'Tool holding onto an item purchased by Governor Turnbull. While Governor Turnbull may have a cause of action to recover an item, James cannot maintain this constitutes fraud as to him.

¶81    As for his final claim that Mosler and O'Tool failed to provide an accounting, thus defrauding him, Mosler and O'Tool have a counterclaim to demand an accounting from James and have a pending Motion For Inspection And To Compel Bank Accounts, filed on May 28, 2008. This counterclaim is addressed below. As James is the one stymieing these efforts, he cannot turn around and state that the lack of an accounting now constitute fraud against him. James's blanket assertion at the end that all of the above "new" theories of liability harmed him economically does not plead with particularity what economic or pecuniary loss James suffered – generalized conclusions cannot save a party from summary judgment where no evidence is shown, and specific facts or circumstances regarding the fraud are not plead.

¶82    While these new claims of fraud are not properly before the Court as they are plead in an opposition to summary judgment, James has not shown a genuine issue of material fact nor has he successfully plead fraud or differentiated his claims from those which form the basis of his breach of contract claim, thus barring them under the gist of the action doctrine. Summary judgment in favor of Mosler and O'Tool on this count will be granted and Count IV will be dismissed.

### D.    James's claim of intentional infliction of emotional distress – Count V

#### 1.    Parties' claims and evidence regarding infliction of emotional distress

¶83    In his Complaint, James states simply that Mosler and O'Tool "intentionally inflicted emotional distress" on him and that he "suffered damages as alleged herein."[209] Mosler and O'Tool argue in their Motion that James never received "any treatment for his alleged emotional distress as previously noted" and state that "he is now a Senator in the Virgin Islands Legislature, operating

---

[209] Pl.'s Compl. ¶¶ 58, 59.

under no apparent distress" and they call his claim "totally frivolous."[210] Mosler and O'Tool contend that the case is "nothing more [than] a disputed business transaction" and they argue there is no "outrageous conduct" in Mosler canceling a relationship in which he spent over $100,000 "without receiving anything from James" including "the 49 chests" that he paid for but James still has.[211] While Mosler and O'Tool do not cite to items in the record, these same claims were made previously in regards to another count and cited there.

¶84  Citing to Mosler's deposition and the e-mail itself, Mosler and O'Tool assert that James provides no "legal or factual basis for his assertion that sending an e-mail to private friends or anyone else would be legally inappropriate."[212] He also provides the newspaper clippings and notes that the paper had already written articles covering that Governor Turnbull attended the auction and had outbid other bidders on several items; the amounts of the bids are also reported.[213] Mosler and O'Tool contend that James has not submitted any facts or law supporting his charge that the public auction sales constituted "confidential information" or the existence of any right to confidentiality under the Auction Contract; that the newspaper ran similar information the day after the auction; and that James fed the paper with news releases about the auction.[214] Mosler and O'Tool argue that in light of these newspaper articles, which they provide, Mosler's conduct in e-mailing the photo to his friends is not outrageous.[215]

¶85  Lastly, Mosler and O'Tool state this claim is the same as a "garden variety breach of contract claim" and that James's "efforts to make the transaction more dramatic falls short of the type of conduct so extreme as to go beyond all ground of decency so as to be regarded and atrocious and utterly intolerable in civilized society."[216] Mosler and O'Tool also assert Mosler has a First Amendment right to privately express his dismay to his friends at the Governor paying for items with large amounts of cash in a bag with his official seal on it.[217]

¶86  James in his Opposition argues that "[t]here are multiple instances of Defendants' conduct that rise to the level of outrageousness sufficient to meet the legal burden of intentional infliction of emotional distress."[218] Citing to his and Mosler's depositions, James asserts that Mosler and O'Tool, with the intent to injure James, took a large amount of cash, "falsely indicated it was the cash dollars paid by the Governor and took a doctored photo" and sent it to the press by e-mail "and other means."[219] It is noted that nowhere in the cited portions of depositions is it stated that the cash in the photo was not the cash the Governor paid. The second act of intentional infliction of emotional distress James asserts is that Mosler and O'Tool contracted with a worker to make

---

[210] Defs.' Mot. For Summ. J. 18.

[211] Defs.' Mot. For Summ. J. 18.

[212] Defs.' Mot. For Summ. J. 19; Defs.' Mot. For Summ. J. Ex. 2 31, 33, 41 (Deposition of Warren Mosler); Defs.' Mot. For Summ. J. Ex. 7.

[213] Defs.' Mot. For Summ. J. 19; Defs.' Mot. For Summ. J. Ex. 19.

[214] Defs.' Mot. For Summ. J. 19.

[215] Defs.' Mot. For Summ. J. Ex. 12; Ex. 18.

[216] Defs.' Mot. For Summ. J. 19.

[217] Defs.' Mot. For Summ. J. 19.

[218] Pl.'s Opp'n 14-15.

[219] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 70-71 (Deposition of Wayne James); Ex. 4 47:21 (Deposition of Warren Mosler).

fifty (50) roundtables[220] but they did not pay him in full, which James asserts severely damaged his reputation causing him extreme emotional distress.[221] James cites to his own deposition for this.[222]

¶87    The third act which James asserts constitutes intentional infliction of emotional distress is that after the Government paid James and he deposited the money, Mosler refused to give the Government the furniture and instead insisted they pay him directly.[223] Again, James cites to his own deposition for this.[224] James states, without citing to any evidence, that the "outcome of the two contracts with Defendants have permanently damaged Plaintiff's reputation causing him emotional distress."[225]

¶88    James also asserts all this "unlawful conduct . . . damaged his ability to transact future business ventures" and the actions caused him "mental anguish, loss of sleep, loss of appetite and loss of enjoyment of life."[226] James cites to his own deposition where he states that he did not receive treatment but he spoke to family members because he was "upset"; that having his reputation tarnished caused him "a lot of distress"; that to have a "negative thing cast over what was really regarded as a beautiful event . . . affects your sleep. It affects your appetite. It affects just your pride in walking in the street"; and "the whole thing even up to now still causes distress in the sense that . . . it was . . . so unnecessary."[227] When asked in what ways did Mosler intentionally inflict stress on James he replied that Mosler holding onto the Governor's chest was one example because he felt "it was definitely something that would make [James] have problems dealing with the Governor in the future. It was just so disappointing."[228] James also states in his deposition that sending out the photograph was intentionally done to cause him stress as was the breach of the hotel contract.[229]

¶89    In their Reply, Mosler and O'Tool again point out James has provided no evidence of emotional distress beyond his "say so" and that, even if the Court does find Mosler and O'Tool's conduct to be "outrageous," there is a requirement that there be some evidence of "some resulting emotional distress as well."[230] Mosler and O'Tool point out that James asserts in his Opposition for the first time that the cash in the photograph was not really the cash paid by Governor Turnbull, the citation provided by James does not backup his assertion, that in paragraph thirty-three (33) of

---

[220] The Court notes that elsewhere, James and Mosler and O'Tool indicated that the agreement was for forty-nine (49) roundtables.

[221] Pl.'s Opp'n 15.

[222] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 184, 197 (Deposition of Wayne James).

[223] Pl.'s Opp'n 16.

[224] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 109-113 (Deposition of Wayne James).

[225] Pl.'s Opp'n 16.

[226] Pl.'s Opp'n 16.

[227] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 137-138 (Deposition of Wayne James).

[228] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 202-203 (Deposition of Wayne James).

[229] Pl.'s Resp. To Statement Of Facts And Counter Statement Of Material Facts Ex. 1 202-203 (Deposition of Wayne James).

[230] Defs.' Reply 12.

his own Complaint James acknowledges this cash, and James is attempting fraud on the Court by now claiming it was not the cash the Governor paid.[231]

### 2. Summary judgment will be granted in favor of Mosler and O'Tool on the infliction of emotional distress claim

¶90  James simply pleads in his Complaint that Mosler and O'Tool intentionally inflicted emotional distress upon him. He pads this barebones pleading in his Opposition with three (3) actions he alleges Mosler and O'Tool took in order to intentionally cause him distress. James alleges that Mosler and O'Tool did these matters intentionally, not recklessly or negligently. James offers no proof that Mosler or O'Tool acted intentionally. However, James's intentional infliction of emotional distress claim is deficient in other ways as well.

¶91  First, these actions are directed at third parties whom James is not related to, the Government, Governor Turnbull, and a craftsman. The Court notes none of these parties are members of his own family. Taking the allegations in the light most favorable to the nonmoving party and assuming their veracity—that Mosler and O'Tool failed to fully pay a workman for items they had not yet received and that they demanded that the Government pay them and not James before Mosler and O'Tool would release the items they had in their possession—neither of these actions allege an act inflicted on James or bodily harm done to someone in his presence. Further, the Court is skeptical of the alleged "outrageousness" of these actions—indeed they appear to be common business issues.

¶92  The third act, that Mosler and O'Tool "falsely" fabricated a photo featuring the Governor's cash, appears intentionally concocted by James in his Opposition to amplify his deficient intentional infliction of emotional distress claim. As mentioned above, there is no evidence that the cash was not the Governor's – this claim arises in James's Opposition without any backing. Also, this action targets the Governor, not James. Even assuming *arguendo*, the action was intentionally done to distress James *and* assuming that the sending of a picture of cash in an email is so outrageous as to be abhorrent to common notions of societal decency, James only alleges damages to his reputation and his emotional health, but has not offered an iota of proof beyond his own generalized assertions that he was mentally and emotionally harmed.

¶93  While in some cases, sole testimony from a complaining party may be sufficient to defeat summary judgment, it is not enough here. No details or narrative is provided, just a broad, umbrella allegation of "mental anguish, loss of sleep, loss of appetite and loss of enjoyment of life."[232] Going beyond the Opposition and Complaint, in the cited portions of James's deposition he describes being upset, disappointed, and emotionally hurt. He describes in the second-person impersonal how such situations can affect one's sleep, appetite, and pride, though he gives no instances where he was so affected. James describes concern over future business ventures and dealings with the Governor. While there is no showing by James beyond his own testimony that Mosler sent out the photograph of the cash and canceled the Hotel Refurbishment Contract with the intent to cause James stress, even assuming it was Mosler's intent the resultant stress so described by James is slight. As the Restatement (Second) of Torts states: "Complete emotional

---

[231] Defs.' Reply 12.
[232] Pl.'s Opp'n 16.

tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."[233]

¶94    Thus, even assuming the intentionality of Mosler and O'Tool, and granting James the element of "outrageousness"—which the Court is highly skeptical a rational factfinder could conclude—James's claims fail as he has not provided a showing beyond conclusory pleadings and his own self-serving testimony in his deposition that he suffered any severe mental or emotional damages. Summary judgment will be granted in favor of Mosler and O'Tool and Count V will be dismissed.

### E.    James's "punitive damages" claim— in Count VI does not constitute a separate cause of action

¶95    James in his Complaint states that "[t]he actions of the Defendants are so reprehensible, done with such evil motives  and with such a reckless disregard for the rights of the Plaintiff that the Plaintiff is entitled to an award of punitive damages."[234] Mosler and O'Tool, citing *Urgent v. Hovensa, LLC*,[235] argue that a claim for punitive damages is not a separate cause of action.[236] They also note counsel for James did not object to a separate count for punitive damages being dismissed in the case *McDonald v. Davis, et. al.*[237] James in his Opposition does not contest this point and Mosler and O'Tool indicate in their Reply that James has therefore conceded it.[238]

¶96    The law of the Virgin Islands is clear on this point – a separate claim for punitive damages cannot stand alone. Therefore, Count VI of James's Complaint will be dismissed.

### F.    Mosler and O'Tool's counterclaim for accounting – Count I of the Counterclaim

¶97    Mosler and O'Tool include in their Answer And Counterclaim a counterclaim for a full accounting from James of "all funds regarding the transaction related to the auction, including a detailed list of all items purchased in Denmark, as well as a detailed list of expenditures made to date."[239] They also assert they are entitled to remittance of any funds held by James in excess of the funds due to him.[240] Mosler and O'Tool recognize in their Motion that there are two motions to compel the production of accounting related information which is necessary "to complete this accounting."[241]

---

[233] RESTATEMENT (SECOND) OF TORTS § 46 cmt. j (1965).

[234] Pl.'s Compl. ¶ 62.

[235] Civil No. 2006/0105, 2008 U.S. Dist. LEXIS 77455 (D.V.I. Oct. 2, 2008).

[236] *Id.* at *30-31 ("All that remains in this case is Count VIII for punitive damages, which is not a distinct cause of action and was improperly plead as a separate count."); Defs.' Mot. For Summ. J. 20.

[237] 51 V.I. 573 (D.V.I. 2009) ("Considering the weight of authority, the Court agrees that McDonald's punitive damages claim cannot stand alone."); Defs.' Mot. For Summ. J. 20.

[238] Defs.' Reply 13.

[239] Defs.' Answer And Countercl. ¶ 7.

[240] Defs.' Answer And Countercl. ¶ 8.

[241] Defs.' Mot. For Summ. J. 20.

¶98    James did not respond to Mosler and O'Tool's counterclaims in his Opposition. In their Reply, Mosler and O'Tool, citing to two District of Columbia cases, *Day v. C.C. Dep't of Consumer & Regulatory Affairs*[242] and *Bancoult v. McNamara*,[243] argue that James has conceded this counterclaim.[244] Considering the pending motions for discovery related to the accounting, the Court will reserve judgment on this counterclaim until after those discovery issues have been resolved and a ruling that covers the accounting issue in its entirety can be entered.

### G.    Mosler and O'Tool's counterclaim for breach of contract – Count II of the Counterclaim

¶99    In their Answer And Counterclaim, Mosler and O'Tool assert that James promised to produce certain items for the hotel, he was paid, but he failed to produce them.[245] In their Motion, Mosler and O'Tool assert that "based on the undisputed facts" they are entitled to summary judgment for $66,700.[246] Mosler and O'Tool cite to Mosler's affidavit for this number, basing it off the $49,000.00 he paid for the 49 chests he states he did not receive and the $17,700.00 he paid to the craftsman as a deposit for the tables that he states were not made.[247] Mosler and O'Tool also state they are entitled to the $28,000.00 Mosler paid James for the furniture patterns since they were not actually copyrighted and he did not receive any of the furniture.[248] As mentioned above, James did not oppose this claim in his Opposition and Mosler and O'Tool assert in their Reply that this claim is conceded.[249]

¶100    Both James and Mosler and O'Tool assert that the other party breached the Hotel Refurbishment Contract. As analyzed above, there exist genuine issues of material fact regarding what the scope of the agreement was and who breached first. As summary judgment will be denied on James's claim that he is due renumeration for Mosler's breach of the Hotel Refurbishment Contract, so summary judgment will also be denied here.

## IV.    CONCLUSION

¶101    On June 2, 2005, James filed a Complaint against Mosler and O'Tool alleging they broke two (2) contracts, that they committed fraud and fraudulent misrepresentation, that they intentionally inflicted emotional distress, and he asserted a claim for punitive damages. On July 19, 2005, Mosler and O'Tool filed their Answer And Counterclaim seeking an accounting, a claim

---

[242] 191 F. Supp. 2d 154 (D.D.C. 2002).

[243] 227 F. Supp. 2d 144 (D.D.C. 2002).

[244] Defs.' Reply 14. *See Day*, 191 F. Supp. 2d at 159 (citing *Lewis v. United States*, Civil Action No. 90-0991, 1990 U.S. Dist. LEXIS 14768, *2 (D.D.C. 1990)) ("If a party fails to counter an argument that the opposing party makes in a motion, the court may treat that argument as conceded."); *Bancoult*, 227 F. Supp. 2d at 149 (citing *Sparrow v. United Air Lines, Inc.*, Civil No. 98-2194-RCL, 1999 U.S. Dist. LEXIS 22054, at *17 (D.D.C. July 23, 1999), *overruled on other grounds*, 342 U.S. App. D.C. 268, 216 F.3d 1111 (D.C. Cir. 2000)) ("Moreover, if the opposing party files a responsive memorandum, but fails to address certain arguments made by the moving party, the court may treat those arguments as conceded, even when the result is dismissal of the entire case.").

[245] Defs.' Answer And Countercl. ¶ 10.

[246] Defs.' Mot. For Summ. J. 21.

[247] Defs.' Mot. For Summ. J. 21; Defs.' Mot. For Summ. J. Ex. 7.

[248] Defs.' Mot. For Summ. J. 21.

[249] Defs.' Reply 14.

for breach of contract, and defamation. On April 7, 2009, Mosler and O'Tool moved for summary judgment to dismiss James's claims and on two of their three counterclaims.

¶102    Having considered the evidence in the light most favorable to the nonmoving party, the Court will grant summary judgment in favor of O'Tool on Count I of James's Complaint, the breach of the Hotel Refurbishment Contract, but only in regards to O'Tool as the evidence shows the possible existence of an agreement as between Mosler and James. The Court will grant summary judgment in favor of both Defendants on Count II of the Complaint, the Auction Contract, as the evidence indicates James repudiated the agreement and, further, that he retained funds in excess of expected profit and cannot, therefore, show damages.

¶103    The Court will grant summary judgment in favor of both Defendants on Count III and Count IV of the Complaint, that Mosler and O'Tool fraudulently misrepresented their "business ethics" to James, and that Mosler and O'Tool committed fraud against James because James cannot show pecuniary loss and they are barred by the gist of the action doctrine. Summary judgment will also be entered in favor of both Defendants on Count V because James has not established through the evidence severe emotional distress. Count VI will be dismissed because the Virgin Islands does not recognize a standalone claim for punitive damages.

¶104    The Court will reserve ruling on Mosler and O'Tool's counterclaim Count I for an accounting as there are outstanding discovery motions related to this issue. The Court will not grant summary judgment on Mosler and O'Tool's counterclaim Count II for breach of contract as there are genuine issues of material fact regarding the Hotel Refurbishment Contract. The Court does not address Mosler and O'Tool's counterclaim Count III for defamation as it was not raised in the Motion For Summary Judgment.

¶105    An order consistent with this Memorandum Opinion follows.

DATED: May 24, 2021

_____
**DENISE M. FRANCOIS**
Judge of the Superior Court of the Virgin Islands

**ATTEST:**

**TAMARA CHARLES**
Clerk of the Court

BY: _____
**LATOYA A. CAMACHO**
Court Clerk Supervisor  5 24 2021